AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. HUGO GALINDO GONZALEZ | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. **10-2454M** |

Complaint for violation of Title 18, United States Code, Section 2422(b)

| NAME OF MAGISTRATE JUDGE HONORABLE ALICIA G. ROSENBERG | UNITED STATES MAGISTRATE JUDGE | LOCATION |
|---|---|---|

| DATE OF OFFENSE Beginning on or before August 10, 2010 through on or about August 18, 2010 | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 2422(b)]

Beginning on or before August 10, 2010, and continuing until on or about August 18, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendant HUGO GALINDO GONZALEZ knowingly used a facility of interstate and foreign commerce, namely, the Internet and the telephone, to knowingly attempt to persuade, induce, entice, and coerce an individual who had not attained the age of 18 years to engage in a sexual activity for which a person could be charged with a criminal offense, namely, lewd acts on a child, in violation of California Penal Code Section 288a.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT **TIMOTHY ALON** |
|---|---|
| | OFFICIAL TITLE Special Agent – Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) ALICIA G. ROSENBERG | DATE October 7, 2010 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Jennie L. Wang x 2450     REC: Detention



## AFFIDAVIT

I, Timothy Alon, do hereby declare and affirm:

## I.   INTRODUCTION

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for 15 years.  My responsibilities with the FBI include investigations into the sexual exploitation of children and child pornography in the Central District of California. The FBI is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, United States Code, Section 2251, *et seq.*  During my tenure as a SA with the FBI, I have conducted and participated in numerous investigations of criminal activity, including investigations of sexual exploitation of children on the Internet and child pornography transmitted via computer.  During the investigation of these cases, I have participated in the execution of numerous search warrants and seized evidence of such violations.  I am currently assigned to the U.S. Immigration and Customs Enforcement ("ICE") Child Exploitation Investigations Group ("CEIG") task force.  I have attended training classes and seminars concerning computer crimes and the sexual exploitation of children on the Internet.

2.      The statements contained in this affidavit are based upon my training and experience, and information provided to me by other law enforcement officers and witnesses as part of this investigation.  Because this affidavit is being submitted for the limited purpose of securing the requested complaint, arrest warrant, and search warrant, I have not included each and every fact known to me concerning this investigation.  I have only set forth facts that I believe are necessary to establish probable cause to obtain the requested complaint, arrest warrant, and search warrant.

## II.   PURPOSE OF AFFIDAVIT

3.      This affidavit is submitted in support of the following:

a.    A complaint against, and a warrant for the arrest of, HUGO GALINDO GONZALEZ for the attempted use of facility of interstate commerce to induce a minor to engage in criminal sexual activity for which a person could be charged with a criminal offense,[1] in violation of 18 U.S.C. § 2422(b).

b.    A warrant to search the following locations for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2422(b):

i.    SUBJECT PREMISES-1: 23334 Maltby Place, Harbor City, California 90710, GONZALEZ's residence, which is more specifically described below.

ii.    SUBJECT PREMISES-2: a four-door black Toyota Tacoma pick-up truck with California license plate 7V83522, GONZLAEZ's vehicle, which is more specifically described below.

### III.    TARGET TO BE ARRESTED

4.    As described in further detail below, evidence shows that GONZALEZ used and attempted to use a facility of interstate commerce, i.e., the Internet, to induce a 14-year-old girl to engage in sexual intercourse with him.

### IV.    PREMISES TO BE SEARCHED

5.    The premises to be searched (collectively, the "SUBJECT PREMISES") are further described in Attachment A and are as follows:

a.    SUBJECT PREMISES-1 is the property located at 23334 Maltby Place, Harbor City, California 90710.  SUBJECT PREMISES-1 is a single story, single family residence.  It has a composite shingled roof and gray stucco exterior, and white wood trim.

---

[1] The conduct at issue would support numerous charges, including but not limited to: Lewd Act upon a Child under the Age of 14, in violation of California Penal Code, Section 288.

2

Directly in front of SUBJECT PREMISES on the raised curb is the painted number "23334."
SUBJECT PREMISES-1 is located on a cul-de-sac.

        b.    SUBJECT PREMISES-2 is a 2005 black Toyota Tacoma pick-up truck, bearing California license plate number 7V83522, registered to HUGO GALINDO GONZALEZ at 23334 Maltby Place, Harbor City, California 90710.

## V.    SUMMARY OF INVESTIGATION

      6.    On August 25, 2010, Department of Child and Family Services ("DCFS") received an anonymous tip that a 14-year-old female (the "victim") from Palos Verdes Estates met with an adult male, who was later identified as HUGO GALINDO GONZALEZ, a 24-year-old resident of Harbor City, and engaged in sex in her residence in August 2010.

      7.    Subsequent investigation by the Palos Verdes Estates Police Department ("PVEPD") revealed that GONZALEZ initiated communication on the Internet with the victim in early August 2010. GONZALEZ and the victim communicated via MySpace messages on the Internet and through their cell phones. The victim told GONZALEZ that she was 16 years old and GONZALEZ told her that he was 19 years old.

      8.    There is probable cause to believe that GONZALEZ violated, and the SUBJECT PREMISES contain evidence of criminal activity in violation of, Title 18, United States Code, Section 2422(b): Attempted Use of Facility of Interstate Commerce to Induce a Minor to Engage in Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense.

## VI.    BACKGROUND

### Child Exploitation Offenses, Computers, and the Worldwide Internet Computer Communication Network

      9.    Based on discussions with SAs who have many years of experience investigating child pornography and child exploitation cases, and my own personal knowledge, I have

3

knowledge of the Internet and how it operates. For example, I know that the Internet is a worldwide computer network that allows communications, information and data to be transmitted from one computer to another across state, national and international boundaries. Among the ways that individuals who utilize the Internet can communicate with one another is through the use of electronic mail messages ("e-mail") and Instant Messenger messages ("IMs").

        10.    The term "computer," as used herein, is defined pursuant to Title 18, United States Code, Section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device but does not include an automated typewriter or typesetter, a portable hand held calculator, or some other similar device."

        11.    ISPs.  Any individual and business can obtain access to the Internet through businesses known as Internet Service Providers ("ISPs"). ISPs:

        a.    Provide their customers with access to the Internet using telephone or other telecommunications lines;

        b.    Provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers;

        c.    Remotely store electronic files on their customers' behalf; and

        d.    May provide other services unique to each particular ISP.

        12.    ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting

4

information, account application information, and other information both in computer data and written record format.

13.     IP Address.   An Internet Protocol address ("IP address") is an unique numeric address used by each computer on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be properly directed from its source to its destination. Most ISPs control a range of IP addresses.

14.     When a customer logs into the Internet using the service of an ISP, the computer used by the customer is assigned an IP address by the ISP. The customer's computer retains that IP address for the duration of that session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during that period.

15.     E-Mail.   E-mail is an electronic form of communication from one person to one or more persons via the Internet which usually contains typewritten correspondence and may also contain audio and visual images. The physical world equivalent to e-mail is writing a letter on paper to somebody and sending it to them via the U.S. Postal Service. An e-mail usually contains a message "header" which generally displays the sender's e-mail address, the recipient's e-mail address, and the date and time of the e-mail transmission. If a sender chooses to do so, he or she can type a subject line into the header.

16.     Chat Rooms.   A chat room is a public area of the Internet that users can visit in order to type messages to one another. When an Internet user joins a chat room, he or she can view the text that is typed by any of the other participants to the chat. The physical world equivalent to a chat room would be for a person to stand in a room full of people and shout a

5

message so loudly that everyone in the room can hear it.  Chat rooms usually are named based on a topic of interest and users can choose rooms to enter by searching for chat room names that reflect their particular areas of interest.

17.     Instant Messages.  IMs allow an Internet user to send and receive messages in real time to one specific user (instead of a group of users).  IMs are similar to e-mail except that IMs are sent virtually instantaneously, and both parties to the message are normally logged into the Internet for the purpose of engaging in a real-time communication.  In order to communicate via IMs, a user must be logged onto the Internet using a unique "screen name," which must be different from those already in use during the ongoing chat session.

a.     IM conversations also can be called "chat sessions" even though they are conversations between only two people.  Individual users can also transmit photographs or graphic files in real time during an IM chat session.

b.     A user can (although it is not required) be in a chat room and also at the same time send an IM to any other online user, including one that is in the same chat room.  The physical world equivalent of this would be if a person is in a room full of people and then leans over to whisper a message in the ear of another individual in the room.  If the message is sent via IM, only the sender and receiver can view the message.

c.     I know from my training and experience, and from conversations with other agents with extensive experience in investigating child exploitation crimes, that it is a common practice for those who attempt to entice a minor to engage in sexual activity via the Internet to utilize e-mail, IMs, and chat room services in committing this crime.

d.     Based on my training and experience, I know that people commonly use abbreviations during IM chatting.  Some examples of these would be: "idk" for the phrase "I

6

don't know"; "brb" for "be right back"; "k" for "okay"; and "lol" for "laughing out loud." I also know that it is common for people in IM chats to type in incomplete sentences, to misspell words frequently, and to not use capital letters. Throughout the IM chat sessions described below, I used some of these abbreviations.

18.     MySpace.  MySpace is one of many social networking websites on the Internet. Social networking services promote social relations among people. Based on discussions with SAs who have many years of experience investigating child pornography and child exploitation cases, and my own personal knowledge, I know the following about MySpace:

a.     Users of certain MySpace services are required to register with MySpace to obtain a MySpace ID. For example, using the "MySpace IM" service to communicate with other MySpace members online requires a user to sign in using a MySpace account. Not all MySpace services, however, require a MySpace account. For example, using MySpace search feature an individual can access public MySpace pages.

b.     A MySpace ID is an unique identifier of a user's account. The registration process requires that the user select an ID (sometimes referred to as a screen name, login name, or profile), a select password, and voluntarily supply some personal information. This process is completed online by the user. MySpace does not verify the information provided by the user, such as their name and address. In addition, MySpace does not require that a user supply a credit card account or other verifiable personal information. As a result, the name and address provided by the user in their MySpace may be fictitious.

c.     MySpace services include the following:

i.     MySpaceIM is an instant messenger that uses the MySpace account to communicate amongst MySpace subscribers.

7

     ii.  MySpace Mobile allows individuals to access MySpace content from a mobile telephone.

     iii.  Groups are forums in which users with similar interests communicate in a group setting.

## VII. **PROBABLE CAUSE**

  19.  On September 10, 2010, I met with PVEPD investigators regarding their investigation of GONZALEZ. Since the initial meeting, PVEPD Detective ("Det.") Luke Hellinga has provided to me select documents regarding their investigation. The following is a summary of the relevant facts.

  20.  On August 25, 2010, DCFS received an anonymous call regarding a 14-year-old female in Palos Verdes Estates who met an unknown adult male for the purposes of sex. The anonymous caller stated that the victim told her mother that she met the man on the Internet. The anonymous caller provided identifying information regarding the victim to DCFS. DCFS forwarded the information from the anonymous caller to PVEPD.

  21.  On August 25, 2010, in response to the information provided by DCFS, PVEPD Officers Reed, Montenegro, and Nahle went to the residence of the victim to speak with the victim and her mother. The officers learned the following:

     a.  The victim stated that approximately three weeks before, she accepted a request from another MySpace user to become friends. The requesting individual utilized a MySpace account of "Surfs up!" and stated that his name was Rodrigo Wright.

     b.  Wright told the victim that his cousin, "Chad," was interested in talking with her. Wright gave her Chad's cellular number of 310-818-9672.

     b.  The victim and Chad sent text messages to each other for about a week when Chad asked if they could meet in person. The victim agreed and invited Chad to her

8

residence. The victim told Chad that she was 16 years old and Chad told her that he was 19 years old.

c. The victim stated that Chad went to her residence and they engaged in sex. Victim stated that Chad used a condom. She could not remember the date they met for sex.

22. On August 25, 2010, PVEPD Officers spoke with the victim's 21-year-old brother. He stated that about a week before, he saw images on the family's computer that were sent to his sister from Chad. The images were sexually explicit in nature and included an image of an individual named "Chad."

23. On August 25, 2010, based on the consent by the victim's family, PVEPD Officer Reed accessed the victim's MySpace e-mail communication between the victim and Wright. Officer Reed observed an e-mail in which the victim advised Wright that she was 16 years old. Wright informed the victim that Chad was 20 years old. Officer Reed located a picture of "Chad" on Wright's MySpace page.

24. On August 31, 2010, PVEPD Det. Russell Venegas accessed the victim's MySpace account. Det. Venegas located user "Surf's up!" as a listed friend of the victim. Det. Venegas viewed the MySpace page for user "Surf's up!" and viewed two photographs on his profile. One image was of a surfer riding a large wave and the second image was the same image as noted by Officer Reed.

25. On September 1, 2010, PVEPD Sergeant ("Sgt.") Aksel Pedersen conducted checks on various law enforcement databases of the phone number provided by "Chad," 310-818-9672. Sgt. Pedersen located an individual associated with that telephone number. Sgt. Pedersen identified HUGO GALINDO GONZALEZ as a potential subscriber to that telephone number. Sgt. Pedersen obtained a California Department of Motor Vehicles ("DMV")

9

photograph of GONZALEZ and noted that it appeared to be the same picture as the one of "Chad" from Wright's MySpace page.

26.     On September 2, 2010, PVEPD Dets. Hellinga and Venegas created a six-pack photograph lineup including the driver's license photograph of GONZALEZ and showed it to the victim. The victim immediately identified the photograph of GONZALEZ as "Chad."

27.     On or about September 2, 2010, Det. Venegas checked DMV records for GONZALEZ. According to DMV records, his last known address was SUBJECT PREMISES-1.

28.     On September 8, 2010, Dets. Hillinga and Venegas observed SUBJECT PREMISES-2 parked on the driveway of SUBJECT PREMISES-1. They observed an individual who appeared to match the description of GONZALEZ, but could not clearly see his face. They learned from DMV records that SUBJECT PREMISES-2 was registered to Jose Gonzalez and Hugo GONZALEZ at SUBJECT PREMISES-1.

29.     On September 10, 2010, Dets. Hillinga and Venegas again observed SUBJECT PREMISES-2 on the driveway of SUBJECT PREMISES-1.

30.     On September 20, 2010, I reviewed a T-Mobile document pertaining to the phone number of "Chad," 310-818-9672. The documents were originally provided by T-Mobile to Det. Venegas on September 15, 2010. According to T-Mobile, the subscriber was Hugo G GONZALEZ at SUBJECT PREMISES-1. The account was established in September 2006. Records indicate that calls to the victim were made on August 14, 2010 and August 18, 2010.

31.     On September 20, 2010, I reviewed a MySpace document pertaining to Wright's MySpace account of "Surf's up!" The documents were originally provided by MySpace to Det.

10

Venegas on September 8, 2010. The registration form listed the name on the account as Rodrigo Wright and residence of Redondo Beach, CA. An e-mail was listed as mopar27@live.com.

     32.    A review of the IP addresses on the MySpace IP Activity Report revealed that the user accessed his account through numerous IP addresses. I conducted a search of the IP addresses through a publicly-accessible website that associates IP addresses to ISPs that owns a specific block of IP addresses. I learned that the majority of the activities were conducted through AT&T Internet and T-Mobile.

     33.    On September 21, 2010, I reviewed a National Comprehensive Report ("NCR") pertaining to GONZALEZ at SUBJECT PREMISES-1. NCR is a report generated by Thomson Reuters, which is a company that consolidates public records, including addresses, driver licenses, property deed transfers, and corporate information, as well as some proprietary records. According to the NCR report, GONZALEZ was associated with SUBJECT PREMISES-1 from July 2005 through June 2006, and with a Redondo Beach address from August 2009 through February 2010.

     34.    On October 5, 2010, I reviewed NCR reports for potential current residents of the Redondo Beach address. I learned that starting in April 2010, three individuals are associated with this address. I believe the association of the three individuals signifies a change in residents at the Redondo Beach address and that GONZALEZ no longer resides at this address.

     35.    On October 4, 2010, I received information from AT&T pertaining to the IP addresses utilized to access "Surf's up!" MySpace account from August 1, 2010 to September 1, 2010. According to AT&T, the subscriber of the IP addresses was Jose Gonzalez at SUBJECT PREMISES-1. The billing start date was listed as February 21, 2006, and the Internet service was still active.

36.     On October 6, 2010, I reviewed a citation details report provided to me by Det. Venegas. According to the report, SUBJECT PREMISES-2 was stopped for a traffic citation on April 15, 2010 by the Los Angeles Sheriff's Department ("LASD"). GONZALEZ was cited for driving without his driver's license in possession. GONZALEZ provided his home address as SUBJECT PREMISES-1 to the reporting LASD deputy.

37.     Based on my training and experience, talking with fellow law enforcement personnel, and reviewing the pertinent facts of this case, I believe GONZALEZ is currently residing at SUBJECT PREMISES-1 and utilized the Internet service there to communicate with the victim for the purposes of meeting for sex.

## VIII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38.     As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of the premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

b. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.

13

Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file do not actually disappear; rather, that data remain on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

        e.        Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the

hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment.

f.       Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

g.       A review of the information on the digital devices sought by this warrant will require an off-site review. This is because I expect the electronic evidence to be comingled

15

with other data, and because it is likely to be concealed in some way requiring extensive forensic review. First, I have no information as to how many digital devices may be located within the SUBJECT PREMISES. A user of a particular IP address could use any number of computers at the same IP address. In addition, in my training and experience, individuals can store pictures on computers, external hard drives, compact discs, DVDs, and other digital storage media – each one of which can contain a large amount of data, and with images be concealed by an innocuous filing system. There is simply no way to search for the images sent to the victim or uploaded to a website without manually looking for image files and reviewing them. Finally, based on my training and experience and given the nature of the offense, I can expect that the user would take some efforts to conceal his/her conduct – particularly if he/she shares the computer with another user, such a household member or visitor. It will take time to search the electronic data for the images in question, as well as other circumstantial evidence of the criminal activity, such as computer logs, date and time information, registration information, e-mails, etc. In an effort to conceal illegal activity, we may require a forensic review for files that have the user has attempted to destroy.

## IX.  ITEMS TO BE SEIZED

39.     Based on the foregoing, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, 2422(b): Attempted Use of Facility of Interstate Commerce to Induce a Minor to Engage in Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense, will be found at the SUBJECT PREMISES:

a.      Records and correspondence, stored in any form, of graphic image files used in attempts to induce minors to engage in sex.

16

b.      Records and correspondence, stored in any form, pertaining to attempts to induce minors to engage in sex.

c.      Documents stored in any form bearing computer user names, including "Surfs up," "mopar," "mopar27," or passwords to computer user accounts

d.      Records or other items which show ownership, possession, use, or dominion and control of computers and related media, including, but not limited to, sales receipts, and bills for Internet access

e.      Records or other items which show ownership, possession, use, or dominion and control of cellular phones including but not limited to cellular phones utilized for 310-818-9672, and related media, including, but not limited to, sales receipts, and bills for cellular access.

f.      Letters and other correspondence, including, but not limited to, electronic mail, chat logs and electronic messaging involving minors and/or in which sex with minors is addressed.

g.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

h.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

i.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found in the SUBJECT PREMISES.

17

                j.       Any computer(s) used to facilitate the above-listed violations and forensic copies thereof.

                k.      With respect to any digital devices falling within the scope of the foregoing search categories, or any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s) of the digital device during the time period between February 21, 2006 and the present.

        40.     As used above in paragraphs 39(a)-(i), the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof. As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices.

        41.     In searching for digital devices and in searching digital data stored on digital devices, law enforcement personnel executing this search warrant will employ the following procedure:

    a. The physical search of the premises will be conducted by law enforcement agents who are investigating the crimes described in the affidavit (the "investigating agents"). Upon securing the premises, these investigating agents will, if they can do so without reviewing the contents of the digital data contained on any digital device, seek to determine if the digital device is itself an item to be seized or contains data falling within the scope of the items to be seized under this warrant. If, without reviewing the contents of the digital data contained thereon, the investigating agents can make the determination that a digital device is itself an item to be seized or contains data falling within the scope of the items to be seized under this warrant, that digital device will be seized. In attempting to determine whether any digital device is itself an item to be seized or contains data falling within the scope of the items to be seized as described in this subparagraph, the investigating agents will not review the digital contents of any such device or any indexes or summaries thereof.

    b. If the investigating agents conclude that they cannot make the determination that a digital device is itself an item to be seized or contains data falling within the scope of the items to be seized under this warrant without reviewing the contents of the digital data contained on the digital device, the investigating agents will consult with law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction who are not involved in the investigation of the crimes described in the affidavit (the "filter team"). The filter team will include law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction specially trained in searching, seizing and segregating digital data (the "computer personnel"). The filter team will be consulted (either on-site or off-site) to determine whether the digital device can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the digital device.

19

          c.     If the filter team determines that the digital device can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, it will be searched on-site only by members of the filter team in a forensically sound fashion that will permit the filter team to make an initial determination whether it is subject to seizure, and will be seized only if the search by the filter team reveals it to be an item to be seized or to contain any data that falls within the list of items to be seized under this warrant.

          d.     If the filter team determines that the digital device cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the digital device will be seized and transported to an appropriate law enforcement laboratory or similar facility for search by members of the filter team. The digital device or a forensic image thereof will be searched only by members of the filter team in a forensically sound fashion and in a manner that allows the data thereon to be reviewed as effectively as possible.

          e.     As explained in paragraphs 38(d) and (e), data falling within the items to be seized in this warrant may be resident in any portion of the digital device. Such data also may be in partial or incomplete form. As a consequence, in searching the digital device, the filter team may examine all of the data contained in the digital device or the forensic copy capable of containing items to be seized as specified in this warrant to view its precise contents and determine whether the digital device and/or data falls within the items to be seized as set forth herein. The filter team may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein. Although the filter team may examine the entire digital device, the filter team will do so only by using search protocols specifically designed to identify items to be seized under this warrant as set forth in greater detail in subparagraph (g) below.

        f.      Following a seizure of a digital device pursuant to subparagraphs (a), (c), or (d) above, the filter team will examine the digital device to extract and seize any data that falls within the list of items to be seized set forth herein. The filter team will seize and retain only data that falls within the scope of the items to be seized under this warrant. Absent an additional warrant or further order of the Court, the filter team will not seize or retain, whether as being in plain view or for any other reason, data that does not fall within the scope of the items to be seized under this warrant.

        g.      In searching a digital device, the filter team will only use search protocols specifically designed to identify items to be seized under this warrant. These search protocols may include the use of tools to exclude normal operating system files that do not need to be searched.

        h.      The filter team will not disclose to this affiant or any other investigating agent, or any Assistant United States Attorney involved in this investigation, any data contained on the digital device other than that which is seized as falling within the scope of the items to be seized under this warrant except with prior Court authorization. The filter team may disclose to this affiant and any other investigating agent or any Assistant United States Attorney involved in this investigation any data contained on the digital device that is seized as being within the scope of the items to be seized under this warrant without further order of the Court.

        i.      The filter team will complete its search of the digital device as soon as is practicable but not to exceed 60 days from the date of execution of this warrant. If additional time is needed, the government may seek an extension of this time period from the Court within the original 60-day period from the date of execution of the warrant.

j.      If the search determines that the digital device is not itself an item to be seized and does not contain any data falling within the list of the items to be seized pursuant to this warrant, the government will return the digital device and delete or destroy all the forensic copies thereof.

k.      If (i) the search determines that the digital device is itself an item to be seized or contains digital data falling within the list of the items to be seized under this warrant or (ii) the filter team believes there is an adequate factual and legal basis other than the plain view doctrine upon which to retain the digital device (if outside the list of items to be seized under this warrant) or the digital data contained on the device that is outside the list of items to be seized under this warrant, the filter team may, prior to making the return described in subparagraph (l) below, seek from the Court an order authorizing the filter team to retain such digital device or digital data. In the event that the government obtains such an order, the digital device or digital data retained pursuant to such an order shall be held by the filter team and, absent further order of the Court, shall not be disclosed to the investigating agents or any Assistant United States Attorney involved in the investigation.

l.      Separate from the search warrant return made by the investigating agents, the filter team will certify and make a return to the Court regarding the seizure of digital devices, forensic copies, and digital data. Such return shall be made as soon as practicable but in any event no later than 14 days after the completion of the search described in subparagraph (f) above. The return will contain the following: (i) a detailed listing of all digital devices seized and retained as themselves falling within the list of items to be seized under this warrant; (ii) a detailed listing of all digital data seized, retained, and disclosed to the investigating agents as falling within the list of the items to be seized under this warrant; (iii) a detailed listing of all

22

digital devices and digital data that the filter team has returned to the party from whom the devices and data were seized; (iv) copies of any court orders authorizing the filter team to seize and retain digital devices and digital data not falling within the list of the items to be seized under this warrant together with a detailed listing of all digital devices and digital data seized and retained pursuant to these court orders; and (v) a certification that all other digital devices and digital data that the filter team have not been authorized to seize and retain have been destroyed or returned.

    m.  At this time, the individuals believed to be the owners of the digital devices are suspected of a crime, and the procedures set forth above are tailored to protect the privacy interests of other parties who are not under suspicion of criminal wrongdoing.

  42.  In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items, subject to the procedures set forth above:

    a.  Any digital device capable of being used to commit, further or store evidence of the offense listed above;

    b.  Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

    c.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

    d.  Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

    e.  Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

    f.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

    g.  Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

  43.  The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not apply to any search of digital media pursuant to any other court order.

## X.  CONCLUSION

  44.  Based on the foregoing, I believe that probable cause exists to believe that GONZALEZ has violated Title 18, United States Code, Section 2422(b): Attempted Use of Facility of Interstate Commerce to Induce a Minor to Engage in Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense.

  45.  Based on the foregoing, I believe that probable cause exists to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2422(b): Attempted Use of Facility of Interstate Commerce to Induce a Minor to Engage in

///

24

Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense, will be found at the SUBJECT PREMISES described above and in Attachments A-1 and A-2.

I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on October 7, 2010, at Los Angeles, California.

_____
Timothy Alon, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
This ____ day of October, 2010.

ALICIA G. ROSENBERG
_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE

25